Our second case, Mr. Owen, number 17-1075. Mr. Owen, whenever you're ready. Good morning, Your Honors, Judge Motz, Judge Agee, and Judge Floyd. My name is David Owen. I am appellate counsel for Ms. Deborah Hickerson and co-counsel with appellate and trial counsel Mr. Austin Watts. We are representing Ms. Hickerson, who was the plaintiff below and is the appellant here, for suffering severe internal injuries as a result of a Yamaha jet ski on which she was a passenger. And the allegations below were basically two. One, that the design of the jet ski was defective in that there was a simple, inexpensive, in fact, more than one simple, inexpensive way to avoid this type of severe injuries, which the defendant, Yamaha, the manufacturer, well knew for a long time and failed to implement. Secondly, that the warnings accompanying the jet ski, which were certainly vibrant and descriptive, were nevertheless not really provided to consumers, to passengers on the jet ski because they were blocked and also otherwise inconspicuous because of the massive advertising and other information that blocked their access, ready access, to persons who needed the information. There are three, basically three, errors that the district court here slipped into that require what we believe is, which is our request to this court, reversal and a remand. And that is, number one, that the district court misread the South Carolina Defective Product Act, in particular, its indirect reference to comment J of section 402A of the second restatement of torts. Second, that the court misapplied the Dauber Federal Rule of Evidence 702 principles to the plaintiff's expert warning and engineering design, two levels, two lines of warnings, arguments or opinions. And third, that the district court mistakenly ruled that South Carolina law would require expert testimony on something as simple as the conspicuousness of a warning, which a is the agency itself. All three of these rulings we think were understandable for a busy trial judge, but all were wrong and all we contend form the basis for reversal and a remand. I'm going to address the design defect comment J of 402A argument and co-counsel Mr. Watts will address the, principally the warnings issues, principally the Dauber Rule 702 issues. So a part of comment J, which is indirectly referenced by the South Carolina Defective Product Act, which is also known as the 402A Act, because what it does is it adopts the plaintiff-friendly principles of strict liability and tort that the second restatement of torts announced in section 402A. The district court, however, misread the meaning of that comment J as several other courts have misread it in South Carolina, both two or three courts of appeals and perhaps three, roughly three, federal district courts in South Carolina. But as we will show, the federal district court... Has the South Carolina Supreme Court taken any of those cases from the Court of Appeals to address that issue? That issue was before the court in Curchio, but the court decided that case solely on the warnings question and reversed it in favor of the plaintiff on the argument that the adequacy of warnings are usually a question for the jury. So the Supreme Court of South Carolina has not addressed this comment J issue in any opinion. One of the corollaries of your argument here is that you want us to reverse the South Carolina Court of Appeals instead of addressing that question to the South Carolina Supreme Court. Well, we're in federal court, Your Honor, so we're addressing it to you. In that effect of what you're arguing, you want a federal court to overrule the South Carolina Court of Appeals on a question of South Carolina law? Indirectly, Your Honor, but what we're really asking is that you clear up confusion in the court and follow the district courts that have properly ruled that warnings and design defect claims continue notwithstanding. But this is a question of South Carolina law. We follow South Carolina courts on it. It doesn't matter what the federal district courts have said. Well, I believe it's the responsibility of the federal courts, including this court, to determine what the South Carolina Supreme Court would do in an instance like this. I thought you just responded there was no South Carolina Supreme Court opinion on the issue. Correct? That's correct. Okay. With that case, we look, there's a lot of law on this, we look at what the intermediate Court of Appeals just said. Yes, Your Honor. Oftentimes you do, and as your opinion suggests. Well, that's what we say we do. Well, you say you do that. Your Honor, I agree. But you also say that you also have a responsibility to look at other factors, which we detail in our, particularly in our reply brief, if, in fact, there's additional information to be sought. Well, why don't we, why not certify the question to the court along these lines? Under South Carolina Products Liability Law, can a product suffer from a design defect when it bears an adequate warning that if read and heated, makes the product safe for use? Well, that would be one way to dispose of the case, Your Honor, certainly. That's not unreasonable. But it's our belief that since we're... But that, of course, isn't the factual background of this case, as I remember it, is your client said in deposition she had not read it, and even if she had, she wasn't sure that she would have acted any differently. Is that not where the state of the factual record is right now? Yes, it is, Your Honor, but it's capable... This seems like it might be an exercise in futility for the, for us to certify this question. Well, I don't think so, Your Honor, because the, her answers in context showed that she was uncertain, but she was being forthright, just like any person who does not see a warning and has to hypothetically imagine if there's warning, whether that person would adhere to it. No, I admire the candor. I agree with you on that, but... No, but it's capable of reading, if I can continue, Your Honor. Did you originally bring this case in federal court, or was it removed? I believe it was brought in federal court. I'm sorry? Yes, it was brought in federal court, Your Honor. You brought it in federal court, then, and you haven't asked us to have the question certified, have you? No. It seems to me that you're content with whatever the federal court would decide on this issue. Yes, Your Honor, because we believe... Well, I understand you're content because you think you'll believe you win, but... Yes, that's correct. You have to be content, period. If you brought it into federal court, you don't bring lawsuits when, I mean, generally there aren't lawsuits unless there's at least something to be said on either side. So you knew there was going to be something said on the other side, and yet you were prepared to have a federal court make the determination, weren't you? Yes, Your Honor, because, in fact, there are cases in the federal district courts in South Carolina that go the other way. Well, I understand that, but you understand that we have to abide by what South Carolina law is, correct? Yes, Your Honor, as you determine the South Carolina Supreme Court would decide this case. Correct. It's my understanding that that's the basis for your decision, based on the factors that we brief in the reply brief. That's a fair question. Is your argument here today consistent with your fetus? I'm sorry, with? Is your argument here today consistent with your writings? Yes, Your Honor. Yes, entirely. One hundred percent. And I might say that those writings, I wasn't going to mention my authorship explicitly, but that those writings on all topics are generally reviewed or considered by other academics as neutral, non-ideological, not plaintiff-friendly, not defendant-friendly. Well, your brief certainly talks about the statute being plaintiff-friendly. Yes, Your Honor. Those words aren't in the statute. Oh, the plaintiff. Yes, that was an interesting argument, rather unfair argument by the defendant. I'm not criticizing you, counsel, but frankly there are a couple times in the brief I couldn't tell whether you were appearing as an expert witness at the appellate level or whether you were counsel. I'm sorry, Your Honor. I'll be glad to address the plaintiff-friendly and then answer any other questions you have. Okay. Plaintiff-friendly. What I stated was that... You're over your time. You have two minutes. Just go ahead and use two more minutes if you wish. Okay. I don't want to encroach on co-counsel's time. No, I'll give you two minutes. Answer the question. What I stated was that 42A on its face, it was the adoption of strict liability and tort for defective products. So it's clearly a pro-plaintiff piece of legislation. The legislature was adopting a plaintiff-friendly piece of legislation. That's the whole idea of my argument. That's what I said. And Mr. Mueller and his team twisted that into my saying that South Carolina is plaintiff-friendly. In fact, it certainly, I would say, is in the middle now. It's very restatement-friendly, but it's certainly not a defendant, excuse me, plaintiff-friendly court now or the law. That answers your question. Thanks very much.  I hear from your colleague. Thank you. Thank you, Your Honors. May it please the Court. My name is Austin Watts, and I represent Appellant Hickerson on the second issue, and that is that the district court abused its discretion when it determined that Yamaha's warnings were adequate as a matter of law. That issue can principally be broken into two arguments. The first argument that I will address is that the district court failed to conduct a Dahlberg analysis on reliability as required under Rule 702 and Dahlberg that resulted in the improper exclusion of Ms. Hickerson's expert testimony. The second issue is that the district court improperly determined that expert testimony was required as to the location, the content, and the format of the warnings themselves. Addressing the failure of the district court to conduct a Dahlberg reliability analysis must probably start at, one, the opinions offered and, two, the district court's rulings because the district court concedes itself that the rulings themselves are not clear. The district court must because they're clearly confused. You said that the rulings are not what? Not clear. Clear. Okay. Yes, Your Honor. She says, excuse me, the district court says that. It's referenced on page 1457 of the joint appendix. She calls, the district court judge herself calls the opinions not clear. And she clarified. Not in a way that you would like, but she clarified, right? Yes, Your Honor. She attempted to clarify. I don't know that she did clarify, but she attempted to bootstrap it and clarify it. It's important to understand what opinions were being offered on the warnings defects in this case. Dr. Kazbekar, who also was the design defect expert, he opined two separate lines of opinions on the warnings in this case. The first was the warnings are inadequate on the product. That was principally three things. He said the warning that said that orifice injuries, Your Honor, and an orifice injury is a severe injury that normally occurs to the rider of a jet ski who's positioned on the very rear. It normally happens to females. It's start off an acceleration of a jet ski. It's very hard. Many people are not aware in the general public, so it's hard to describe it. But before you run out of time, why don't you tell us what was the basis of his opinion? The basis of his opinion. Of the inadequacy on the warning opinion, he had three. The first was that the warning itself said to avoid orifice injuries, you must wear wetsuits or clothing that provides equivalent protection. In his research, the industry custom had a pictogram on it that competitors had as the wetsuit on a figure is black. Yamaha's warning had a white wetsuit. And he said that that was confusing for the general public because most wetsuits are black. They're not white. But didn't he come to that conclusion just because he'd been around water sports before? Wasn't that the basis of his opinion? Well, Your Honor, he also was involved in water sports, owns jet skis, and can draw on that for his expertise. But, no, his specific – Did he ever test his theory? Sorry? Did he ever test his theory? Did he test the theory on whether the – Black versus white. Which is better? Which is more noticeable? Which is used more? No, he didn't use – No, he didn't perform any tests, did he? Right. He didn't perform tests on that. He used the industry – What did he perform a test on? Which of his theories did he back up with a test? Well, Your Honor, the testing that he did, he did own water testing, right, with the actual product, the Yamaha jet ski itself. He did own water testing in which he – Did he test the proposed label? No, Your Honor, and we're not arguing that that was not improperly excluded, all right? He didn't test it. We'll concede that. But as to the inadequacy opinions, right, he didn't test them, but he offered different indicia of reliability, ANSI standards, industry custom. And, again, he did test one of his opinions. When he was on – he tested the actual product itself. He took the product and he tested the efficacy of whether wetsuits would actually prevent it. He found in his testing, right, from people who were using it and falling off into the jet wash, that he wasn't sure that the efficacy of the warning was correct, that a jet ski orifice injury could be prevented by a wetsuit. If he wasn't sure, how does that help your case? Your Honor, he – the way that helps is he went – then went and said if he's not sure that a wetsuit would, how can the ability of the remainder of the warning, which says wear equivalent protection to a wetsuit to prevent the injury, how is that not confusing to the public? If they don't understand that different wetsuits may or may not work depending on the thickness, as he testified, then how are they able to determine what equivalent protection is? Your Honor, I see that I'm out of time. Thank you. I think you have some rebuttals now. Thank you. Just to quickly respond to a couple of those. Number one, ANSI actually has a provision about the white on black and black on white thing. Mr. Kasperkar didn't know that, and it says that a manufacturer can use either. They're equivalent to ANSI. So at that point, I think if you read his whole deposition, this is about whether the wetsuit in the little pictogram is white on black or black on white. He never was expressing a point of view that that was going to affect anybody's behavior anywhere. Now, I want to – I think we ought to be clear, even though these arguments here are somewhat different than they were made to the to the effect that comment J means exactly what it says. If you have an adequate warning, and this one has been determined to be inadequate as a matter of the law, and if it's going to be safe for use, if complied with, the product is not defective. And there are cases in South Carolina, there's not one case that indicates any contrary rule, and what they are asking this Court to do is reverse all those South Carolina cases and, you know, kind of march off on your own and adopt a view for policy reasons and other reasons that some in the academic community have suggested. But comment J means exactly what it says, and we, I think, in our ordinary life, we can think of dozens of examples where that would apply. Take, for example, helmets on motorcycles. If I have a warning on my motorcycle that tells me to wear a helmet and I don't wear a helmet, that warning makes that product safe. You don't have to do anything to that motorcycle to protect the head. I'm sure that intelligent lawyers could come up with a theory that maybe the motorcycle ought to have some Bluetooth technology so that they'll know if you're really wearing a helmet or not. The courts could be flooded with arguments about that. Same thing with the thing that you see in all cars, and you see on this product, you see on anything that moves, don't drink and drive. Now, could you equip all those products with breathalyzers and say, hey, that warning's no good. I want to have a separate product design that will make sure that you're not drunk. And why couldn't somebody come in and say, well, don't drink and drive. That's the definition of an inadequate warning because how many drunk people actually read warnings? And so, therefore, that warning has to be bad, and, therefore, we should have breathalyzers on everything. There are most, and particularly this is true under the facts of this case, any warning that tells you to wear, take this product here, it tells you you're supposed to wear a personal flotation device. Why couldn't you have another Bluetooth argument about that? You'd have to plug it into the product. Why is that warning? But if you were to go out on this product, and you don't know how to swim, and you drown, I would expect that the district court in this case and practically every state is going to issue the same ruling here. You were told to wear the PFD. You made the conscious decision not to wear it or to not read the warning. And if you drown as a result, case closed, as it should be. And that's the same case here. This product has not one, but two warnings on it on the front and the back, this one here and this one here. And what CASPER's warning opinion was and what they told the district court. Where is that in the JA? I can't see that far. Oh, sorry. No, you don't have to bring it up. Just tell me. It must be in the JA, right? You don't know where it is. I'll find it. Yeah. But this is the front warning that they were referring to as the uniform label. And Yamaha had a second warning on the back, and that's in that exhibit A that we had in the brief. These two warnings are exactly 41 inches apart from each other. And what CASPER cars, and as they explained to the district court, what the principal argument was about the warning is that they wanted to add a third one. And the third one was going to be on the seat, right, 14 inches from the back warning. And that's what he felt was going to be the solution. And that's the thing that he had no literature for, no studies, no science. He didn't even actually take a third warning and put it on the product. What he did is he made up a drawing of it. But he didn't do anything to say that if somebody is not going to read or see two warnings that somehow adding a third one is going to make any difference to anybody. And I will, in that case, I would like to turn the court's attention to its decision in Hood versus, I don't know how to pronounce that, Roe v. America Corporation. And in that case, the plaintiff there, as here, was asking for more warnings. And the court said, Hood assumes that the cost of more detailed warning labels is a minimum in this case, and he claims that such a warning would have prevented his injury. But the price of more detailed warnings is greater than their additional printing fees alone. Some commenters have observed that the proliferation of label details threatens to undermine the effectiveness of warnings altogether, citing Henderson and Tversky in articles called The Doctrinal Collapse in Product Liability. And the court goes on to add, as manufacturers append line after line onto product labels in a quest for the best possible warning, it is easy to lose sight of the label's cumulative value as a whole. And then the court goes down in the next paragraph and concludes, Nor can he prove that an increased label clutter would bring any net societal benefit. We hold that the warnings that Roe v. Ryobi provided are adequate as a matter of law. And I think that's the same kind of problem that you have here. You have two warnings already that, given the conduct that they were engaging in that day, didn't affect their behavior. And making an argument that somehow we're just going to add more warning clutter on there by throwing a third one in the middle. And you have to think about this from the manufacturer's standpoint. If three warnings on orifice injuries are what is required, then why not three warnings on personal flotation devices? Why not three warnings on the age limitation that we recommended that you have to be 60 and 80 years or older? Why not three warnings on keep a care? I mean, if you end up having three of all of them, you know, the product's going to look like chicken pox. I mean, and nobody, and this is, I think, the point the court was making in Hood, if you just keep on piling on warnings and piling on warnings and piling on warnings, then there's a net society cost there, and that is that nobody will read anything. You have to be, they have to be. And this is why, when Dr. Kasparkar was in his deposition, he initially, in talking about the Uniform Label, said, well, there's an awful lot of information there. You know, people might not read it. And I said, well, so you want to take something out. What do you want to take out? And then he finally backed off from that and said, oh, no, I don't want to do that, A, for the obvious reason that his real opinion was that he wanted to add more warnings, and B, he said, well, in order to figure out what warnings ought to be good and not, you'd have to do a more careful study, and I haven't really done that study on the Uniform Label. And so he backed off from that, but he recognizes that warning clutter can be a problem, and it's not just a simple throw another one on there. What can it cost? How simple can it be? Because there is the problem that the court recognized in Hood, and that's the obvious reason why this and why the district court properly concluded. When you come to warnings questions like this, expert testimony is required. You can't have, you know, the jury without the benefit of knowing what the ANSI standards are and without some science about whether if you add more warnings on there, people will just stop reading them altogether. It seems like this is why expert testimony is needed, and this is why I think the district court made the correct decision that without expert testimony, the warnings case would fail. The other point, the warnings, the Uniform Warning Label, this also was in Exhibit A. This is the Uniform Warning Label on the product. And this, of course, was the plaintiff and her friend Michelle. But it's right there. I mean, the notion that somehow that's a, I mean, Kasparkar's argument is that the two locations that Yamaha had on the front and the back were not good enough. Well, this one is literally right under their nose. I mean, I don't know how, but he had, you know, obviously many of the manufacturers put it right there on the glove box, a place where you would be accessing if you wanted to put your cell phone or your keys in there. And clearly, but he had no science or literature to support the notion that somehow people aren't going to see it, observe it, read it if they want it. On the comment, Jay argument, principally what, I do want to talk about the whole notion about the positions that they gave the district court below and here, you know, are kind of different. I mean, below, they were arguing that, yes, warnings will trump the design, as some say. And, but they only do that if there's, if the defendant makes certain required concessions. Now, the cases in South Carolina don't say that. And, but they were agreeing with the notion that under comment, Jay, if you have a good warning, it will obviate any need for further design changes. They agreed to that below. That is not the position they're taking here now. Now they're taking the position that comment, Jay, shouldn't be. And in comment, Jay, these are the, some excerpts from the comments in the statute. Comment I is unreasonably dangerous products. Comment J is entitled directions and warnings. Comment K is unavoidably unsafe products. The position that they're taking now, and that Professor Owen has taken in his other writings, is that this sentence here, where a warning is given, the seller may reasonably assume that it will be read and heeded, and a product bearing such a warning, which is safe for use if it is followed, is not in a defective condition, nor is it unreasonably dangerous. The position they're taking here is that that somehow is some sort of a scrivener's error. That it really, according to Professor Owen, this thing should have been under this comment, K, unavoidably unsafe products. And that somehow in the four years that they worked on the restatement second, somehow or another somebody just missed it, I guess. And it really didn't go in comment J, should be in K. Now here's the significant thing about that. An unavoidably unsafe product, according to Professor Owen and many, is a product that in design alone can't be made safe for use. So it's one that has to come with a warning. Now, the key part here is that Dr. Kasperkar, in his deposition, testified that this is an unavoidably unsafe product. On pages 305 and 306 of his deposition, he twice volunteered the notion that this product can't be designed so it's safe for use because people are going to fall off. Some people, as they did this very day, ride it around in crazy maneuvers, intentionally trying to throw people off. And since it's the water that is what causes the problem, water skiers get this, people on water slides going down when they hit that pool at the bottom can get this injury. It's the water that's the hazard, and you can't kind of design out the water. And so this is a product that has to come with a warning. In fact, I asked him on those pages, hey, you want the seat strap and things of that kind. If I put those seat straps on there, you're going to say the product's safe for use. And he goes, oh, no, no, you can't design this so it's safe for use. It has to have a warning. Well, that makes it an unavoidably unsafe product. And even under the current position, if an adequate warning is given for an unavoidably unsafe product, then you're good. The result's the same. You don't have to do anything for the design. So while I don't agree that after working for four years that CrossFit got this wrong, that somehow it's in the wrong section somehow, it is what it is. It says what it says. And it's in the South Carolina statute, and it should be interpreted to mean exactly what it says. And as I said, I think we can all think of dozens of examples in which that's the exact result. Now, I realize that the third restatement has taken out the reference to warnings because, as many have said, the third restatement is kind of a radical departure from the second restatement. They have all these kind of discrete boxes. And while there's a lot of debate about whether the discrete boxes is a sensible way to look at product reliability cases, nonetheless, there's no suggestion in any South Carolina case that South Carolina is going to move forward and adopt the third restatement at all. I mean, it is a radical departure from the second restatement. The reference to the Branham case, I think, proves nothing. As the advisors to the third restatement duly noted, before the first draft of the third restatement came out, nearly half of the states had adopted a risk utility test, as South Carolina has done. And they've done that in the confines of Section 402A. So the fact that the Branham case has now adopted risk utility as opposed to the consumer expectation test says nothing about their views about the third restatement because half of the states that have adopted risk utility did it under 402A. And there's obvious reasons for that. I mean, there are a lot of products in which consumers really can't have an expectation about it other than the manufacturer is going to balance the risks and make a reasonable decision. And it's in that context, particularly when you get to questions about how fast should your airbag deploy. If it's too fast, it could injure or kill small children and light women. If it's too slow, heavy vests that people won't be saved. Consumers don't have an expectation about the speed of the deployment of your airbag. What they're hoping is the manufacturer is going to balance the risks and the benefits and make a decision. And that's in that context that courts, even under 402A, have adopted the risk utility test. And so I think it seems like the South Carolina statute is the 402A Act. The 402A Act says what it says. This language is clear and ambiguous. I think it makes sense, and I think you can think of dozens of examples where it applies as it does here. And I think the district court rendered a decision in this case consistent with 20 or 25 years of South Carolina law. So she did the right thing, and the ruling was proper. Thank you very much. Do you have any rebuttal? Yes, Your Honor. Quickly in rebuttal, Your Honors. I want to start with a couple of what he showed because I think it's important. In all honesty, it was our argument. I don't know that you can see that here lately, but in all honesty, we want to try to drive that. One of our main arguments for why the third one really is not an issue, I understand that Your Honor, is that they've been talking to you about 41 inches or what have you on the speedometer. We conceded that he didn't have it. It's not really part of his ability. But he critiqued this one as the one on the back. He said, Your Honor, Antti's standards were too congested. The issue of reliability. The district court did not do its own reliability analysis on whether Antti was reliable in a standard society in terms of whether that was too congested. It looked like it kind of was. In the second, Your Honor, this isn't even the JET scheme. This is not the JET scheme that was called up in the end. I find it very peculiar that the actual JET scheme was used to show that something went away. I would submit to you that it wasn't. It wasn't used because it can be found in the JA. In the back of the JET scheme, they have a small warning, very small warning, right below Yamaha advertising and right above Nano XL advertising. You can't see the warning on the back of the JET scheme. Again, their expert, Dr. Nathan Doris, said yes, it's smaller than both the advertising. He conceded himself that you couldn't see what they call the uniform label, that it was blocked here. He himself, Dr. Doris, put enough evidence in to defeat summary judgment alone on the summary judgment motion. Your Honor, again, the whole 10 minutes spent on the third warning, it appears is an attempt to shift the ball, right? And to possibly tell you that the only opinion that he had was this third warning. It's not representative of the rulings below. The district court properly recognized there were two different sets of warnings in both the in limine order and in the 59E order when she attempted to clarify. She did not conduct a Dauber reliability analysis as to the first set of opinions, only warning inadequacy. And she failed also to determine whether this was outside the kin of the jury. To see whether the location in that form, in and of itself, required expert testimony. South Carolina law is well established, just like law across the nation, that expert testimony is only needed when it's outside the common experiences and general knowledge of the jury. She instead said that product liability cases themselves, she categorized them, the district court categorized them and said that these types of cases tend to implicate human factors and industry standards, which is what Dr. Kaspekar, his expert opinions were for. For the ANSI standards, the industry custom, what was done outside of Yamaha and done on other competitors' jet skis and on his own water testing. Everything that he didn't test was relatively due to location. Hickerson did not need expert testimony to defeat summary judgment on the fact that this warning was obstructed during view and the supplemental warning on the back she couldn't see and was hidden underneath advert. Yamaha was more interested in advertising than they were warning. And for these foregoing reasons in our brief and oral argument, we respectfully request that you remand and reverse the district court. Thank you very much. May it please the court, there are a couple of seconds left, could I bring a case to the court's attention? Sure. That I think it was the defendant was duty bound to bring since their co-counsel is on the case as well. As we just discovered it a few days ago, it was decided by federal district court in South Carolina. It's entitled McCree against Dick's Sporting Goods, Inc. And the citation is 2017 Westlaw 5201525, dated November 9th of this year. It runs in favor of the plaintiff and against Yamaha. It's not a Yamaha Jetsky case, but it explicitly rules on a motion 59E motion. It reverses the district courts. Yes, but it's in our favor. And it shows the confusion. Sir, just send us a 28-J letter that cites the case, that doesn't make an argument. We really can read and we'll read. Oh, yes, Your Honor. I would be surprised if it deals with South Carolina law. Oh, yes, it's a South Carolina federal district court on South Carolina law. Federal district court in South Carolina. Yes, ma'am. Okay. And I should direct the letter to you, Your Honor, is that correct? Sorry. Why don't you talk to the people in the clerk's office? Yes, ma'am. We're going to take a short recess and we will then come back. Thank you. Oh, we'll come down and greet the lawyers first. This honorable court will take a brief recess.
judges: Diana Gribbon Motz, G. Steven Agee, Henry F. Floyd